UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

<u>United States of America</u>

    v.                                             Criminal No. 22-cr-129-LM-1
                                                 Opinion No. 2024 DNH 054 P

<u>Jeromy Pittmann</u>

## O R D E R

Defendant Jeromy Pittman is charged with four offenses related to an alleged scheme to receive payments for writing fraudulent letters of recommendation for Afghan nationals seeking Special Immigrant Visas. <u>See</u> doc. no. 24 (indictment). Presently before the court is Pittman's motion to suppress. Doc. no. 49. Pittman moves to suppress his allegedly involuntary statements on November 4, 2021, and any evidence derived from those statements, primarily on the ground that he was fatigued when he made his statements. For the following reasons, Pittman's motion is denied.

### BACKGROUND[1]

As of November 2021, Pittman was a Lieutenant Commander in the United States Naval Reserves. He was also employed in a civilian capacity for the United States government in an overseas post, residing in Italy. His position in the

---

[1] All facts are taken from Pittman's motion except where otherwise indicated. Although Pittman requests an evidentiary hearing, for the reasons explained below, the court finds that Pittman has not shown that he is entitled to a hearing. <u>See</u> <u>United States v. Cintron</u>, 724 F.3d 32, 36 (1st Cir. 2013).

Reserves, however, required him to regularly travel to the United States to attend drill. Moreover, Pittman had previously resided in Pensacola, Florida.

Pittman's obligations with the Reserves required him to attend drill in Gulfport, Mississippi on November 4 and 5, 2021. He arrived at his hotel in Gulfport at approximately 3:30 a.m. local time on November 4. He had been in transit for approximately thirty-one hours.[2] Pittman tried to sleep from 5:00 a.m. to 7:00 a.m. and then attended drill until 5:00 p.m.

When Pittman returned to his hotel at approximately 5:20 p.m. on November 4, he was approached by Naval Criminal Investigative Service Agent Rachel McGranaghan and Special Agent Kevin Naylon with the Special Inspector General for Afghanistan Reconstruction ("SIGAR"). The agents had previously planned to try and speak with Pittman while he was in Italy, but later changed their minds and decided to try and meet with him while he was in the United States to attend drill. Naylon identified himself with SIGAR and said he had some questions for Pittman. Pittman believed that Naylon's questions pertained to complaints Pittman had made about waste, fraud, and abuse while deployed to Afghanistan. He asked Naylon if the questions could wait until the next morning or some other time because he had been awake for the majority of the previous forty-five hours. Naylon told Pittman that the interview would not take more than a few minutes. Pittman agreed to speak with the agents.

---

[2] It is unclear whether Pittman slept during any portion of this time in transit.

At the beginning of the interview, the agents provided Pittman with a Garrity form and a Uniform Code of Military Justice ("UCMJ") Article 31(b) waiver form. See Garrity v. New Jersey, 385 U.S. 493 (1967); 10 U.S.C. § 831(b). Pittman asked why he was being given these forms. The agents told him that the forms were merely a formality. The agents did not read the forms to Pittman. Pittman signed and initialed both forms.

The agents questioned Pittman from approximately 5:50 p.m. to 8:30 p.m. about the allegations in this case. The questioning took place in a conference room at the hotel in Gulfport where Pittman was staying. At multiple points during the interview, Pittman said that he would prefer to pause the questioning so that he could get some sleep, as he was extremely tired from his travel and inability to get any meaningful sleep over the previous forty-five hours. The agents responded to Pittman's requests by telling him that they were almost finished and would not take much longer.

The government has provided a video recording of a portion[3] of the interview.[4] The video shows that Pittman appears tired. The agents acknowledged that Pittman was visibly tired on a few occasions. Naylon acknowledged that Pittman had "a pretty tough . . . schedule" due to the jet lag from his travel. McGranaghan acknowledged "you've gotta be tired. Yes, I can understand that.

---

[3] According to Pittman, the entirety of the interview was recorded but portions were lost due to technical issues.

[4] The video was conventionally filed in the clerk's office.

What time is it in Italy I don't know." Naylon knew that Pittman was "eager to go" but told him that "we're not far from being done." However, while Pittman appears to be tired, he is not on the verge of falling asleep and he is able to answer the agents' questions in a lucid and coherent fashion. The video also shows that the agents were professional and courteous in their questioning and that they did not threaten Pittman in any manner or make promises of leniency.

## DISCUSSION

The admission of a defendant's involuntary statement violates his right to due process. United States v. Jackson, 918 F.2d 236, 241 (1st Cir. 1990). A statement is involuntary if the officers overpowered the defendant's will such that "the statement was not his free and voluntary act." United States v. Jacques, 744 F.3d 804, 809 (1st Cir. 2014) (quoting Bryant v. Vose, 785 F.2d 364, 367-68 (1st Cir. 1986)); see also United States v. Hufstetler, 782 F.3d 19, 21 (1st Cir. 2015) (statement is involuntary if it is "coerced" and therefore not "the product of a rational intellect and free will" (quoting Lynumn v. Illinois, 372 U.S. 528, 534 (1963))). Courts consider the totality of the circumstances to determine whether a statement is involuntary. Jacques, 744 F.3d at 809. Relevant factors include "the length and nature of the questioning, promises or threats made by investigators, and any deprivation of the suspect's essential needs," as well as "the defendant's personal circumstances, including his age, education, intelligence, and mental condition," and "his prior experience with the criminal justice system." Id. The

prosecution has the burden of proving voluntariness by a preponderance of the evidence. Hufstetler, 782 F.3d at 22.

Pittman primarily argues that his statements to Naylon and McGranaghan in November 2021 are involuntary due to his fatigue. He points out that he had been awake for "the majority of" forty-five hours prior to the start of questioning due to his travel from Italy to the United States. Doc. no. 49 ¶ 46. He claims that the agents "preyed" on his lack of sleep and specifically chose to question him in unfamiliar surroundings at a time when they knew he would be tired from his travel and service obligations, rather than in Italy where he lived and where they originally planned to try and speak with him. Pittman contends that he asked to end the interview at multiple points but the agents frustrated his requests by continuously telling him that they would conclude shortly.

It is true that "deprivation of basic necessities, coupled with an unreasonably prolonged . . . interrogation, can affect the voluntariness" of a defendant's statement. United States v. Carpentino, 948 F.3d 10, 28 (1st Cir. 2020). "Even so, a defendant asserting that a [statement] was involuntary on this or any other basis must show some form of coercive law enforcement conduct or overreaching." Id. (citing Colorado v. Connelly, 479 U.S. 157, 170 (1986)); accord 2 Wayne R. LaFave et al., Criminal Procedure § 6.2(c) (4th ed.) (highlighting Connelly's requirement that the statement must stem from "coercive" police tactics; "'even the interrogators' knowledge that a suspect may have mental problems does not make the suspect's statements involuntary' unless there are coercive tactics beyond mere questioning"

5

(quoting Miller v. Dugger, 838 F.2d 1530, 1537 (11th Cir. 1988))). Indeed, cognitive impairment caused by fatigue or other, similar circumstances "is never, by itself, sufficient to warrant the conclusion that [a] confession was involuntary for purposes of due process; some element of police coercion is always necessary." United States v. Luck, 852 F.3d 615, 623 (6th Cir. 2017) (quoting United States v. Newman, 889 F.2d 88, 94 (6th Cir. 1989)). Thus, without more, the agents' choice to question Pittman despite their knowledge of his fatigue, as well as their requests to continue the interview despite Pittman's requests to stop, do not render his statements involuntary. See Carpentino, 948 F.3d at 28 (statement voluntary where defendant "fail[ed] to link the allegedly weakened physical condition he suffered from his lack of food and sleep to any police misconduct"); Carter v. State, 241 P.3d 476, 487 (Wyo. 2010) ("While it is true that Carter requested to be left alone so that he could sleep, the mere fact that the detectives continued to ask Carter for information is not dispositive of whether Carter's statements were voluntary.").

      The totality of the evidence shows that Pittman's statements were not the product of a will overborne by coercive police tactics. The questioning lasted approximately three hours—which is not the sort of marathon interrogation that courts have found coercive. Compare Ashcraft v. Tennessee, 322 U.S. 143, 154 (1944) (finding defendant's will overborne by thirty-six-hour interrogation), with Carpentino, 948 F.3d at 28-29 (finding defendant's will not overborne by six-hour interrogation). Pittman does not allege that the tone of the agents' questions was anything but professional. See United States v. Hughes, 640 F.3d 428, 438 (1st Cir.

6

2011) (statement not involuntary where "the tone of the interview was cordial"). Indeed, the partial recording of the interview shows that the agents were courteous.

Pittman does not allege that the agents threatened him physically or with harsher punishment if he refused to speak with them, nor that the agents offered him leniency in exchange for answering their questions—and no threats or promises were made in the partial recording of the interview. See Jacques, 744 F.3d at 809-10. He does not allege he was denied food, water, or medical care. See United States v. Rojas-Tapia, 446 F.3d 1, 4 (1st Cir. 2006) (statement may be involuntary when "law enforcement officials subjected defendant to physically coercive punishment such as unreasonable deprivation of food"). Nor that he was denied the ability to speak with others. See LaFave et al., supra (important consideration is whether defendant was denied ability to speak with friends or family).

The agents provided Pittman with a Garrity waiver form and a UCMJ waiver form, both of which he signed. Cf. Berkemer v. McCarty, 468 U.S. 420, 433 n.20 (1984) ("[C]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of Miranda are rare."). While Pittman contends that his waivers were not valid because of his fatigue, here too he does not connect the purported involuntariness of his waivers with any coercive or improper official tactics. And courts have held that an officer's statement referring to a waiver form as a mere formality does not transform an otherwise valid waiver into an involuntary one. See United States v. Syslo, 303 F.3d 860, 866 (8th Cir. 2002).

Pittman takes issue with the agents' statements that the questioning would not take long, when in reality it took approximately three hours. While "trickery can sink to the level of coercion, this is a relatively rare phenomenon." United States v. Flemmi, 225 F.3d 78, 91 n.5 (1st Cir. 2000). Any deceptive assurances must be of a nature that they overpower the defendant such that his statement is not the product of his own free will. See, e.g., Lynumn, 372 U.S. at 534 (statement involuntary where police falsely threatened to take suspect's child away if she did not cooperate). "[C]onfessions procured by deceits have been held voluntary in a number of situations." United States v. Byram, 145 F.3d 405, 408 (1st Cir. 1998). See generally LaFave et al., supra (collecting cases). Here, even if it was improper for the agents to assure Pittman that the questioning would not take long (a matter on which the court expresses no opinion), such assurances did not overpower his will such that his statements are the product of coercion—especially when considered in light of Pittman's personal circumstances.

The court takes judicial notice that Pittman was in his early fifties at the time he was questioned. Thus, his age does not weigh in favor of a finding of involuntariness. See J.D.B. v. North Carolina, 564 U.S. 261, 280-81 (2011) (observing that a juvenile's statement is more likely to be involuntary). More importantly, Pittman is an educated professional—a Lieutenant Commander in the United States Naval Reserve and the holder of a civilian position overseas with the United States government. See Davis v. State, 837 S.E.2d 817, 822 (Ga. 2020) (statement voluntary where defendant "was educated, [and] had additional

8

education through the military"); Commonwealth v. Amaral, 125 N.E.3d 22, 31 (Mass. 2019) (statement voluntary where defendant was a college graduate). Pittman does not allege that he was "suffering from a physical injury, physical illness, . . . mental illness, mental deficiency, emotional distress, or an abnormality caused by drugs or alcohol." LaFave et al., supra (footnotes omitted). And, while Pittman contends that he would have been more comfortable had agents elected to question him in Italy where he lived, Pittman is an American citizen whom American authorities questioned at Pittman's hotel at a time when he was present in this country to fulfill his obligations as an American Naval Reserves officer. Cf. United States v. Yunis, 859 F.2d 953, 965 (D.C. Cir. 1988) (explaining that "a defendant's alienage and unfamiliarity with the American legal system" should be considered in determining voluntariness); United States v. Nakhoul, 596 F. Supp. 1398, 1402 (D. Mass. 1984) (fact that defendant was Lebanese national weighed in favor of involuntariness despite fact that he lived in America because "his understanding of American law, customs, and constitutional rights may be limited").

      Finally, although Pittman requests an evidentiary hearing on his motion, the court does not believe one is warranted in this case. "A criminal defendant has no presumptive right to a hearing on a motion to suppress." United States v. Cintron, 724 F.3d 32, 36 (1st Cir. 2013). To obtain an evidentiary hearing on a motion to suppress, the defendant must make a threshold showing "that there are factual disputes which, if resolved in his favor, would entitle him to the requested relief."

9

Id. (quoting United States v. Francois, 715 F.3d 21, 32 (1st Cir. 2013)). Here, even taking the facts laid out in Pittman's motion as true, his statements were voluntary under the totality of the circumstances. Thus, he is not entitled to an evidentiary hearing.

## CONCLUSION

For the foregoing reasons, Pittman's motion to suppress (doc. no. 49) is denied.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

July 3, 2024

cc:   Counsel of Record